WASHINGTON, D.C.

## SWORN STATEMENT

I, Merinda Ellis, GS-13, Video Communications Specialist, Video Examiner, Forensic Audio Video Image Analysis Unit (FAVIAU), Laboratory Division, Federal Bureau of Investigation Headquarters (FBIHQ), Federal Bureau of Investigation (FBI) do hereby solemnly swear:

I have been advised by Supervisory Special Agent (SSA) Julio Gracia of the Office of Equal Employment Opportunity Affairs, FBI, that he is investigating my complaint of employment discrimination (F-01-5625) pursuant to Title 29 of the Code of Federal Regulations, Part 1614.

I understand that the issues under investigation are whether I was discriminated against based on RACE (African-American), SEX (female), and REPRISAL when:

(1) Beginning on October 15, 2001, I was denied the opportunity to earn compensatory leave, my work was intensely scrutinized, special requirements were placed on me to report to Quantico for weekly file reviews, I was denied training opportunities, and reported for alleged security violations concerning the locking of my safe;

(2) On or about December 3, 2001, I was advised that a Non-Serious Misconduct, Office of Professional Responsibility (OPR), investigation was opened concerning games on my computer;

PAGE 1 OF __14__                                  AFFIANT'S INITIALS ____

(3) Subsequent to filing this complaint I received a "Does Not Meet Expectations" Performance Appraisal Report (PAR);

(4) Since January 8, 2002, 11 out of 15 cases assigned to me were expedite cases;

(5) Since filing this complaint I was threatened with denial or cancellation of leave; and

(6) On March 19, 2002, the pending OPR investigation into my alleged misconduct was expanded to include the allegation that I failed to provide truthful information during an OPR investigation in December of 2001.

## BACKGROUND

The following is a brief description of my background and experience with the FBI:

| | | |
|---|---|---|
| SEX: | Female | |
| RACE: | African-American | |
| ENTERED ON DUTY: | June 15, 1980 | |
| OFFICES OF ASSIGNMENT: | June 1980 | Identification Div. |
| | September 1985 | Technical Services Division |
| | April 1987 | Laboratory Division |

I believe that I have been the subject of discrimination, as illustrated by the official misconduct and abuse of authority by Supervisor Thomas Musheno, Program Manager Dale Linden, Unit Chief John James Ryan, and Section Chief Keith DeVincentis. Management has created an atmosphere that makes it

PAGE 2 OF __14__                                    AFFIANT'S INITIALS _M.E._

difficult to do my work because of constant restrictions, changes in procedures, and requirements. This affects the other Examiners in the Unit, Ronald Evans and Robert Keller. However, management seems to go out of their way to find discrepancies in my work performance and I do not see the same diligence directed to the other Examiners. For example, Keller has been neglectful of his duties for years and has never been written up for blatant poor performance. Management has been aware of this situation for years, because prior supervisors have even asked me about his performance. I feel persecuted and harassed at a different standard than the others and I think that this is because I am a black female.

On March 15, 2001, Evans, Keller, and I met with Section Chief Keith DeVincentis to bring to his attention actions by the previous Unit Chief Athena Varounis and the current Unit Chief John Ryan that we believed hindered the effectiveness, credibility, and morale of the Examiners in the Unit. Due to reorganization in the Unit, a backlog of casework was created and we became responsible for alleviating this problem. Unit Chief Ryan believed that we were not proceeding fast enough. We sought DeVincentis's support to get more equipment and to allow us to catch up at a more reasonable pace.

After this meeting, a generally antagonistic attitude towards us emerged from management.

Special requirements were placed on me to report to Quantico for

**weekly file reviews; opportunities to earn compensatory leave were denied; my work was intensely scrutinized.**

On March 21, 2001, a mandatory examiner schedule was created just for the three of us who attended the meeting with DeVincentis. This schedule required that the three of us go to the Engineering Research Facility (ERF) at Quantico, Virginia, one day per week for case reviews on our work from the previous week. FAVIAU is divided between FBIHQ and ERF. Unit Chief Ryan would conduct the case reviews at ERF. It should be noted that there were five other Examiners at FBIHQ and they were not subjected to going to Quantico, until we complained to Program Manager Dale Linden.

To go to the weekly meetings at Quantico, I was instructed that I had to leave from home because I lived within 50 miles of Quantico. The travel time was not considered part of my workday. However, for those who lived farther away, they could first come to FBIHQ to pick-up an FBI car for the trip to Quantico and their travel time from FBIHQ would be considered part of their workday. When working past scheduled hours, I was the only one denied compensatory leave. On a couple of occasions the Program Manager at Quantico, Dale Linden, would grant compensatory leave, but my HQ supervisor, Thomas Musheno, would deny some or all of the leave. Musheno would argue that my job really did not take that much time or that Linden had not intended to give the compensatory time.

On October 10, 2001, my car was in the shop. So, I

PAGE 4 OF 14                                    AFFIANT'S INITIALS _M.L._

went to FBIHQ to use the FBI car for the trip to Quantico. I notified my supervisor, Musheno, in person. Even though I had notified him about what I was going to do, he later "docked" an hour of compensatory leave for my travel time from FBIHQ to ERF.

I have been repeatedly discouraged by Musheno and Linden from requesting compensatory leave to work on expedite cases by having to explain my need for the time although it is obvious that I have been overloaded with expedite cases. When other examiners have to stay late or commute back to FBIHQ after working in Quantico, compensatory leave is provided. If I have to return to FBIHQ after working past my shift at Quantico, I am monitored and questioned.

On another occasion, I was in Quantico for the weekly meeting, but I had to leave early for a doctor's appointment. I wanted to use compensatory leave. Musheno was at Quantico, too. So, I presented him with a leave slip which he signed. The next day, I received an email from him stating that he signed the leave slip because it was a doctor's appointment but that in the future I was expected to spend a full eight hours at Quantico for the weekly meeting. Also, he asked for documentation of my doctor's appointment, which I then provided. In other words, I had to prove my activities. I know of no other person in the Unit who has to provide this type of proof.

Another situation regarding compensatory leave involves leave that I have been accruing by working on a project to update the Laboratory Case File Management System. This project is

PAGE 5 OF  14                                   AFFIANT'S INITIALS  M.L.

managed by Supervisor Rosalie Contreras. I have been working on it for over a year. In May 2002, Contreras notified me that she had received an email from Musheno stating that I was not to work on her project and that if I had any questions about this I should see him. At this point, I knew that discussing this issue with Musheno would not make a difference. I found out later, that Musheno had stated to Contreras that his decision was based on pending casework. Musheno never discussed this with me.

Not only have I been subject to weekly file reviews, but also Musheno has retrieved my case files from the Records File Unit and compared my work notes to reports of my daily/weekly schedule. He found only one discrepancy in which the date of a case I worked on was off by two days. He asked me to explain this, which I did. He reported this one discrepancy as a basis for a "does not meet expectations" rating for a critical element of my PAR. He never told me that my explanation was unsatisfactory. To my knowledge, I am the only Examiner subjected to this kind of scrutiny. Also, Keller, Evans, and I, have been subjected to four technical reviews during the last six months. These technical reviews entail personal observation of us as we use the technical equipment in our video examinations. To my knowledge other examiners have not have bee subjected to these kinds of technical reviews.

While management scrutinizes my work, a white male co-worker, Robert Keller, who has been delinquent regarding numerous case examination for years, has never been officially reprimanded

PAGE 6 OF __14__                                      AFFIANT'S INITIALS _____

or disciplined. By speaking with Keller, I know that over a span of five years none of his PARs have reflected his poor performance. In fact, some of his work has been delegated to me for completion. In the past, he has received compensatory leave to catch-up on overdue work. I have answered phone calls from clients in field offices and law enforcement agencies who inquired about their cases, many of which were over a year old.

### Denial of training opportunities.

In January 2001, all Examiners in the audio/video unit were requested to submit GETA forms for training classes. After attending a Unit meeting where Unit Chief Ryan indicated that he was interested in information on DVD technology, I signed up for a course to receive training. My GETA form for this class was signed by Ryan in January. The class was scheduled for the end of February. In mid-February, a previous supervisor informed me that I could not go to the class. He could not provide me with a reason as to why I was not permitted to attend the class. He later admitted that Ryan instructed him to tell me that I could not attend the class. Later, I requested a meeting with the Ombudsman, Sarah Ziegler, and Ryan to get some understanding as to why I was prohibited to go to the training class. During this meeting, I learned that there was no clear-cut reason why I could not take the class. Ryan had some general training goals for the unit but could not justify why I could not attend the class. After the meeting, I was allowed to attend the DVD training class

PAGE 7 OF __14__                                    AFFIANT'S INITIALS _M.L._

that was being offered again in May. However, in March, I was tasked to give a presentation on DVD technology, before I attended the class. I have never seen this happen, where a person is required to give a presentation on a subject before he takes the class on the subject.

Alleged security violations concerning the locking of my safe.

On an email dated October 7, 2001, Musheno advised me that he found that my safe had been left open over the weekend. Musheno had come in to work on that Sunday.

I will accept that he found the safe open. However, I never received any official notification about checking safes. On one occasion, Examiner Ron Evans's safe was left open, too, but he did not receive a reprimand. I feel targeted by Musheno because of the zeal he goes after in finding faults when it concerns me.

On or about December 3, 2001, I was advised that a non-serious misconduct, Office of Professional Responsibility, (OPR), investigation was opened concerning games on my computer. This OPR investigation into my alleged misconduct expanded to include the allegation that I failed to provide truthful information during the OPR interview.

In the first meeting Musheno held when he became our supervisor, he told Keller, Evans, and me that we had a reputation for being lazy and that he did not want us reading

PAGE 8 OF 14                                    AFFIANT'S INITIALS MK.4

newspapers or playing games on the computers. Musheno has a reputation for not being cordial. I played the computer game "Tetris" on my break time to relax. In August 2001, Musheno came to my desk to talk about a case and he discovered the game minimized on my computer screen. He began to interrogate me about what was minimized on the screen and I became defensive. I told him that I could not tell him what he was seeing with his eyes. Musheno filed an OPR complaint on this matter. The investigation was initiated on November 5, 2001, and I was notified on December 3, 2001. The investigation was later expanded by OPR on March 19, 2001, alleging that I had failed to provide truthful information regarding the game.

I think that Musheno could have reported this on my PAR instead of to OPR. The other Examiners continue to do similar things, such as reading the paper, and, I suspect, play computer games, but are not subjects of OPR investigations.

On July 15, 2002, OPR completed its investigation. The results of the inquiry did not establish that I had provided untruthful information but found that I continued to play the game after having been instructed to cease such activity. The penalty will be suspension from duty without pay for 10 days. I will be appealing this decision. It is ironic that OPR's findings discuss that I had been insubordinate, but OPR did not take into consideration that I felt that my supervisor was being abusive towards me and singling me out.

PAGE 9 OF 14      AFFIANT'S INITIALS M.E.

<u>Subsequent to filing this EEO complaint I received a "Does Not Meet Expectations" PAR.</u>

On January 7, 2002, I received my Performance Appraisal Report (PAR) with a summary rating of "Does Not Meet Expectations". Up to this point, my ratings had been fully successful or superior. To support the rating, Musheno included items that I think are questionable. As an example, he included an item relating that while passing in the hallway on morning, I did not respond when Musheno said "Hello". I had already greeted him earlier in the day. Later that afternoon during my file review with him, he inquired as to why I did not greet him in the hallway. I told him that I did not feel like it. He asked me if I had read my critical elements in my PAR lately. He suggested that I look them over. Given the timing, I think that my EEO complaint affected the outcome of my PAR. I filed my EEO complaint in December 2001.

It has been very difficult for me to work with Musheno as my Supervisor. In July of 2001, he was so verbally confrontational and belligerent that I reported him to Program Manager Dale Linden. I told Linden that I did not appreciate the manner that Musheno spoke to me. Linden said that he would speak with Musheno. Later, Musheno approached me and apologized by explaining that he could sometimes be a little acerbic and excitable. Recently, on June 27, 2002, Musheno had to apologize to me again. He admitted that he had overreacted when he

PAGE 10 OF 14                                   AFFIANT'S INITIALS _____

challenged me on why I needed another examiner to help me retrieve and carry some video equipment from the Director's Dining room.

Since January 8, 2002, 11 out of 15 cases assigned to me were expedite cases.

I believe that this was another form of retaliation for filing an EEO complaint. Soon after I filed the complaint, January 2001, I noticed that I was being assigned a larger number of "expedite" cases. These are special cases which require quick turnaround times and are very time consuming. Evans and Keller where not getting the same number of cases. I felt that I was being set up to fail. Linden does the case assignments. I feel that this was his way of discouraging me from questioning his management procedures, particularly because I am a black woman. Otherwise, I do not understand why he would assign all these important expedite cases to me, given that he thought that I was a poor performer. And if he thought that I was a good performer and that I could do all this work, as my Reviewing Official on my PAR, he should have offered a better summary rating.

Since filing this complaint I was threatened with denial or cancellation of leave.

Recently, on February 19, 2002, I was threatened with denial or cancellation of leave if I did not notify Musheno in

PAGE 11 OF 14                                    AFFIANT'S INITIALS _____

advance. After Musheno had left work one Friday evening, I stayed to work late. I then decided to take the following Tuesday off, which was after a holiday Monday. So, I filled a leave slip and placed it in the time register. I came to work on Saturday and so did Musheno. I asked Musheno whether he had seen my leave slip. He said that he had and said that we would talk about it on Wednesday. On Wednesday, he got on my case for not notifying him in advance about the leave. He argued that there was no guarantee that he would have seen me at work on Saturday. He said that if necessary, I should call him at home to notify him about my intent to take leave.

I have been a dedicated FBI employee for twenty-two years. My ability to expeditiously complete my case work has never been a problem until I worked under this current chain of command. Linden and Musheno have tried to portray me as an uncooperative employee, but I am not. I have no record of personnel problems. Their management decisions indicate harassment and discrimination towards me.

## WITNESSES

I do not have any specific witnesses that I would like interviewed, but I understand that the investigator will interview any witnesses who may be identified during the course of the investigation.

PAGE 12 OF __14__                                    AFFIANT'S INITIALS _____

## CORRECTIVE ACTION

The corrective actions I seek are:

1.) Transfer out of the Unit.

2.) Have 1.5 Hours of compensatory Leave restored, for the time that was docked when I used the FBI car to travel for FBIHQ to Quantico on October 10, 2001.

3.) The option to work "flex time".

4.) The option to earn compensatory leave.

5.) Anger management and diversity training for Musheno and Linden.

6.) Modification of my 2001 PAR so that it will reflect a summary rating of "Meets Expectations", as well as ratings of "Meets Expectations" for all of the critical elements in the PAR.

I do not have any knowledge of any additional information that I believe is relevant to the scope of the inquiry as described to me by SSA GRACIA.

I have read this statement consisting of this and thirteen other pages. The entire document is true and complete to the best of my knowledge and belief. I understand that the

PAGE 13 OF 14                                    AFFIANT'S INITIALS _MK_

information I am giving is not to be considered confidential and that it may be shown to interested parties.

_____
MERINDA ELLIS

Sworn to and subscribed before me at Washington, D.C., on this 26th day of July, 2002.

_____
JULIO GRACIA
Supervisory Special Agent
EEO Investigator

PAGE 14 OF __14__                           AFFIANT'S INITIALS _M.E._