WASHINGTON, D.C.

## SWORN STATEMENT

I, Thomas Musheno, GS-14, Forensic Examiner, Supervisor, Forensic Audio Video Image Analysis Unit (FAVIAU), Laboratory Division, Federal Bureau of Investigation Headquarters (FBIHQ), Federal Bureau of Investigation (FBI) do hereby solemnly swear:

I have been advised by Supervisory Special Agent (SSA) Julio Gracia of the Office of Equal Employment Opportunity Affairs, FBI, that he is investigating a complaint of employment discrimination (F-01-5625) pursuant to Title 29 of the Code of Federal Regulations, Part 1614.

I understand that the complainant is Merinda Ellis and that the issues under investigation are whether she was discriminated against based on RACE (African-American), SEX (female), and REPRISAL when:

(1) Beginning on October 15, 2001, she was denied the opportunity to earn compensatory leave, her work was intensely scrutinized, special requirements were placed on her to report to Quantico for weekly file reviews, she was denied training opportunities, and she was reported for alleged security violations concerning the locking of her safe;

(2) On or about December 3, 2001, she was advised that a Non-Serious Misconduct, Office of Professional Responsibility (OPR), investigation was opened concerning games on her computer;

(3)   Subsequent to filing this complaint she received a "Does Not Meet Expectations" Performance Appraisal Report (PAR);

(4)   Since January 8, 2002, 11 out of 15 cases assigned to her were expedite cases;

(5)   Since filing this complaint she was threatened with denial or cancellation of leave; and

(6)   On March 19, 2002, the pending OPR investigation into her alleged misconduct was expanded to include the allegation that she failed to provide truthful information during an OPR investigation in December of 2001.

### BACKGROUND

The following is a brief description of my background and experience with the FBI:

SEX:                         Male

RACE:                        White

ENTERED ON DUTY:             October 30, 1994

OFFICES OF ASSIGNMENT:       October 1994        Laboratory Division
                                                 (to present)


I have been Merinda Ellis's supervisor since June 2001. I believe that Ellis's accusations as listed above are either false or the result of her frustrations that management has taken a pro-active stance and is making employees accountable for their actions.  We have given Ms. Ellis numerous opportunities and warnings for her to correct her behavior and performance.  Ellis, along with Video Examiners Ronald Evans and Robert Keller, who I

PAGE 2 OF   28                      AFFIANT'S INITIALS  $\mathcal{TM}$

also supervise, have had a history of having little or no
supervision and as a result have been accustomed to, in effect
"manage themselves" without accountability for their time or
work.  I have not singled Ellis out.  I apply the same principles
of supervision to Ellis, Evans, Keller, and the other employee I
supervise, Anita Semper.

In regard to the March 15, 2001, meeting in which
Ellis, Evans, and Keller, met with Section Chief Keith
DeVincentis to complain about previous actions by former Unit
Chief Athena Varounis and the current Unit Chief James Ryan, I am
aware that a meeting did happened but I am not familiar with the
details.  The meeting had no bearing on my actions as a
supervisor.

In regard to Ellis's allegations, I will address each
topic as discussed with SSA Gracia on July 11, 2002, listed
below.


Ellis's allegations:

(1) special requirements were placed on her to report to Quantico

   for weekly file reviews

(2) opportunities to earn compensatory leave were denied

(3) her work was intensely scrutinized

(4) she was denied training opportunities

(5) she was reported for alleged security violations regarding


PAGE 3 OF __28__                    AFFIANT'S INITIALS __TM__

the locking of evidence safes, but other people were

not reported for the same infraction

(6) she was reported for playing computer games

(7) subsequent to filing this EEO complaint she received a Does

Not Meet Expectations PAR

(8) she was unfairly assigned 11 expedite or "specials" cases in

January

(9) since filing this complaint she has been threatened with

denial of cancellation of leave

(10) a pending OPR investigation was expanded to include that she

failed to provide truthful information during an OPR

investigation

(1) Special requirements were placed on her to report to Quantico

for weekly file reviews.

Due to previous problems, including time and

attendance, and production rates, experienced by their former

supervisors Peter Smith and David Bonner and reported to Unit

Chief James Ryan, a mandatory schedule was created on May 23,

2001, for Ellis, Evans, and Keller, which required that the three

Video Examiners go to the Engineering Research Facility (ERF) at

PAGE 4 OF ___28___          AFFIANT'S INITIALS  Tm

Quantico, Virginia, one day per week to work cases and for case reviews. Please note that all three Video Examiners were required to attend, not just Ellis. Unit Chief Ryan had initiated this requirement for several reasons: to acclimate the Video Examiners to the facilities and co-workers at ERF because the FBIHQ portion of the Unit might soon be moving to ERF, to introduce the Video Examiners to the different equipment at ERF because much of the equipment used by the Video Examiners at FBIHQ would not be moved to ERF, to have the Video Examiners work under the supervision of Video Program Manager Dale Linden so that Linden could observe the Video Examiners' technical expertise, and to increase production rates by the Video Examiners. SC DeVincentis, UC Ryan and Mr. Linden had been aware of the low production rates and other problems with the Video Examiners at HQ and initiated the above instructions. Additionally, in June 2001, when I took over as supervisor, I did a review of those production rates. The Video Examiners at FBIHQ had averaged for the five and one half years prior to that my assignment a very low production rate of completing approximately **one case every two weeks**. Whereas, the Video Examiners at ERF had a production rate of approximately **two or more cases per week**. The fact that the HQ Video Examiners were producing approximately 25% of what their counterparts were producing at ERF was alarming. It is true that other Forensic Examiners at FBIHQ were not required to report to Quantico, however, these

PAGE 5 OF ___28___                    AFFIANT'S INITIALS TM

examiners were Imaging Examiners, not Video Examiners.  The
Imaging Examiners' responsibilities are different.  They did not
have low production rates and the Imaging Examiners at HQ had
other duties including supervisory responsibilities, research,
and project management.  There was no intent to "punish" the
Video Examiners by making this requirement.  The purpose was to
train and improve the performance of the Video Examiners.

From the beginning of this requirement by UC Ryan,
there were problems with all of the Video Examiners reporting to
Quantico on a timely basis.  The Video Examiners decided that
they would first report to HQ, sign in and then take a Bureau car
to Quantico and then return to HQ early in time to "beat
traffic".  This was in direct conflict with UC Ryan's directive
because the actual time spent at Quantico was much less than an
entire work day.  Due to the number of problems with employees
reporting to Quantico, I contacted Janet Cantamesa, who was in
charge of Human Resources for the Laboratory Division.  She
advised me that given that the Video Examiners were assigned to
FBIHQ, they could be required to go to Quantico as part of their
assignment to FBIHQ and that the Division was not required to
provide transportation.  Cantamesa also advised that it was
appropriate to have the Video  Examiners report at the beginning
of their work shift and leave at the end of their shift, therein
working at Quantico for a "full" day.  However, she advised that
because Evans lived near Baltimore, which was beyond a 50-mile
radius from Quantico, the Division could provide him with

PAGE 6 OF ___28___              AFFIANT'S INITIALS  TM

transportation, although it was not required to do so, for his commute from FBIHQ to Quantico. Based on this information, only Evans was allowed to report to FBIHQ to get a car and then go to Quantico. The commute time from FBIHQ to Quantico would be considered official time. The Video Examiners were informed of the policy, as described by Cantamesa, that they had to report directly to Quantico (except for Evans) and that they were responsible for their own transportation (again, except for Evans). Since the inception of this requirement, there were problems with Ellis arriving at Quantico on time. At first, not only did she not report on time, as instructed, on a number of occasions, but she also deliberately disobeyed orders not to use a Bureau car to commute to Quantico on a couple of occasions. And as a result of her going to HQ to pick up the Bureau car she, again arrived late at Quantico.

**(2) Opportunities to earn compensatory leave were denied.**

It is my understanding that prior to having me as their supervisor, the HQ Video Examiners took compensatory leave when they deemed it necessary without pre-approval from their supervisor. When I took over as supervisor, they were instructed that **all** leave had to be pre-approved. This was a direct order from my Unit Chief, James Ryan, and is consistent with Bureau policy. The reason for us to pre-approve leave is to make sure that leave is justified. That is, the cases from which compensatory leave is earned really do need to be worked

PAGE 7 OF __28__                      AFFIANT'S INITIALS _TM_

expeditiously. On a number of occasions, compensatory leave has been approved for all of the Video Examiners (including Ellis) in order for them to work expedite cases. And on a number of occasions leave has been requested and not granted for all Video Examiners because, after considering the case requests, time needed to complete the case requests, etc., it was determined that the Video Examiners could easily finish their cases during regular work hours. Additionally, on numerous times Ellis requested compensatory leave for the commute to Quantico. When that was denied, based on the prior instructions from Cantamesa, Ellis requested compensatory leave to first go to HQ and pick up her evidence for cases that she planned to work at Quantico. And she also requested compensatory leave for the return to HQ to return that evidence. That request was also denied because the Bureau has an evidence courier that makes daily deliveries to and from HQ, starting from Quantico. Regarding compensatory leave, I have documented one occasion where Linden granted Ellis one hour compensatory leave to return to HQ with evidence from four cases that she said she needed to work "first thing" the next day at HQ. Since the courier did not deliver evidence to HQ from Quantico until between 12:00 to 1:00 the next day, Ellis would not be able to work on these cases "first thing". One hour of compensatory leave was granted by Linden for Ellis to return the evidence to HQ so that she could work the cases "first thing" the next day. Linden informed me of the compensatory leave. However, Ellis signed her time and attendance register for two hours of

PAGE 8 OF ___28___                    AFFIANT'S INITIALS ___TM___

compensatory leave. I had to remind her that she had only been granted one hour of compensatory leave to return the evidence. Ellis was instructed to correct the register. Additionally, Ellis had requested the compensatory leave for return of evidence of four cases to HQ so that she could work the cases "first thing" the next day, but Ellis's daily report shows that she took annual leave the next morning from 7:30am until 12 noon and did not work on any of the four cases on that day after arriving at HQ at 12:00pm. In fact, her daily report document indicates that she did not work on any of the four cases until three weeks after that day. This is in direct conflict with the reason that she requested the compensatory leave, to return the evidence to HQ personally so that she could work on it "first thing" the next morning. Additionally, even after the above incident, Ellis again tried to sign in the time and attendance book for compensatory leave without pre-approval. And was reminded once again that compensatory leave needed to be pre-approved.

Ellis had been working on a project with Supervisor Contreras in the Laboratory Division and was earning compensatory leave which I had been granting. After discussion with Program Manager Linden regarding Ellis's low production rates, Linden instructed me to inform Contreras that Ellis was not to participate in the project because Ellis's time should be spent on the backlog of her regular casework. I agreed with this decision. If Ellis earned compensatory leave while working for

PAGE 9 OF ___28___                    AFFIANT'S INITIALS ___TM___

Contreras, she would in effect be spending less time doing her case work than she normally does. Considering the fact that Ellis is usually behind in her case work, she needed all of the time she could get to meet minimum requirements. Ellis reported that she had never been informed of the above action until she asked Contreras for more compensatory leave work. Had Ellis requested pre-approval from me to work for Contreras, as she had been instructed to do numerous times previously, I would have informed Ellis of our decision, although Ellis never approached me to request compensatory leave or to inquire as to why leave was not granted by Contreras.

As I mentioned previously, Ellis had been granted compensatory leave if she had been doing expedite case work and her request had been justified. Please note that Ellis's accrued annual leave, compensatory leave, and sick leave hours has been very low, if not totally drained or borrowed, and it seemed that Ellis was very interested in "banking" compensatory leave. Regarding this, it is my understanding that when Ellis complained to Linden numerous times about not getting approval for compensatory leave, Linden made it abundantly clear that her case production levels were very low and if she could bring those numbers up to three cases per week, then he'd be happy to grant Ellis as much compensatory leave as she wanted.

**(3) Her work was intensely scrutinized.**

Ms. Ellis has not been subjected to any disparate

PAGE 10 OF __28__                    AFFIANT'S INITIALS ⟨signature⟩

scrutiny in comparison to the other FBIHQ Video Examiners, Evans and Keller.  Evans and Keller also received a Does Not Meet Expectations PAR for the same rating period that Ellis questions in this action.  They have also been reprimanded for certain actions or inactions on their part.

Regarding Quality Assurance (QA) matters, Ellis seemed to have a greater problem adjusting to new QA guidelines, but **all** examiners are to follow QA guidelines.  These are not options.

Regarding, technical reviews, **all** of the Video Examiners have gone through technical reviews of their work.

Regarding daily reports, **all** examiners in the unit are required to submit a daily report to their supervisor.

The supervision that I am required to do as a responsibility of my position includes such things as time and attendance, quality assurance, production requirements, etc.  All employees are treated equally.

I believe since Ellis has had little or no supervision in the past, she may be mistaking **any** supervision as "disparate scrutiny".

**(4) She was denied training opportunities.**

It is my understanding that, prior to, and during my tenure, Ms. Ellis was never denied any training opportunities. It is also my understanding that prior to my tenure, one of her scheduled training activities had to be rescheduled.  However,

PAGE 11 OF __28__                    AFFIANT'S INITIALS _M_

she **did** attend the rescheduled training session.

All training has to be pre-approved and I do believe
that I have never denied Ms. Ellis training.  I do know that I
**have** approved training for Ms. Ellis. I believe that Ellis's
statement that she has been denied training opportunities is
false.

**(5) She was reported for alleged security violations regarding
the locking of evidence safes.**

In late June 2001, Quality Assurance Program Manager,
Barb Snyder, placed a notification on all of the exit doors in
the Unit reminding employees to lock their safes at the end of
the day.  This sign, placed at eye level, reminded employees to
lock up their evidence at the end of the day.  She also verbally
notified employees of this requirement.  This policy is a Quality
Assurance rule and not optional.  On July 11, 2001, at the very
first meeting that I had with the Video Examiners, I  again
reminded them that their evidence had to be locked up every
night.  Between that date and August 21, 2002, all of the Video
Examiners' safes were found open on several occasions. I
continued to remind the employees to lock up their evidence safes
at the end of the day.  On August 21, 2002, I began to document
these infractions.  All were reminded of security and Quality
Assurance policies after each event.  After those warnings, from
August 21, 2001 until November 18, 2001, during random checks, on

PAGE 12 OF __28__                    AFFIANT'S INITIALS _TM_

four separate occasions, Ellis left her safe unlocked.  Even
though she had been notified both verbally and in writing each
time that this had occurred.  The dates are documented in her
PAR.  In contrast, it was found that Evans left his safe unlocked
twice and Keller was not found to have left his safe unlocked
during those times.  Had Ellis's safe been found unlocked only a
couple of times and had Ellis's attitude regarding Quality
Assurance policy been more accepting, I would not have written
her up for performance problems, but I believe that Ellis was
unable or unwilling to abide by Quality Assurance and security
policy, as illustrated by the email sequence that I include
below.  Additionally, there were other Quality Assurance issues
that Ellis had problems with, including properly marking her
evidence and proper report writing procedures.  Many are
documented.  I had stressed to her that these policies were not
"options".

-10/7/01  E-mail to Ellis from Musheno
Merinda,
Upon inspection on 10/07/01, your safe was open.  I locked it.  Please check,
everyday before you leave, to make sure your safe is locked.
Thank you.
Tom

-10/9/01  E-mail response to Musheno from Ellis
I did check my safe Friday before I left and to my knowledge it was closed &
locked.  Is it your new policy to check EVERYBODY'S safe on the weekends?

-10/10/01 E-mail response to Ellis from Musheno
Merinda,
-If you check the second drawer of your safe, you will find a piece of paper
locked in the safe noting that I did find your safe open and that I intended
to lock it.  If you are absolutely certain that you locked your safe on Friday
then we need to notify security that there may be a problem.  Please call me
if you are absolutely certain that you locked your safe.
-Just in case there is a problem, by close of business today, Wednesday,
October 10, 2001, change your safe combination and fill out one of the forms

PAGE 13 OF ___28___                    AFFIANT'S INITIALS _TM_

with the new combination, seal it, and forward it to me.—As to whether it is new policy to check everybody's safe on the weekend, I have been instructed to do spot checks on the safes. A spot check could occur anytime. The reason that we do spot checks is to determine if there is a problem. If you need further explanation, please ask me or Barb.
Thanks,
Tom

—10/10/01 E-mail is sent from UC Ryan to all FAVIAU employees reminding them to lock their evidence safes and that random spot checks are policy and would continue.

And again on October 19, 2001, Ellis' evidence safe was found unlocked after working hours.

Ellis was not targeted. The Quality Assurance and security policy applies to everyone in the Unit. On one occasion while I was checking the evidence safes, I mistakenly did not determine that one of Evans's safes was unlocked because of the order in which I checked the safe's mechanism. Ellis was upset and brought this to my attention that I did not ask Evans to remember to lock his safe. She believed that I was only checking her safe. Evans informed me that I had missed his safe being unlocked. After some investigation I realize that I had made an error in the order in which I checked the safe's mechanism. I did then ask Evans to lock his safes at the end of the day. And I now check the safe's mechanism in the proper order, that being to first activate the locking lever into the vertical position and then squeeze the safe's handle. I make sure that the lever is in the vertical position. If you squeeze the safe's handle when the lever is in the horizontal position, then the safe appears to be locked, because the drawer will not open, even if the safe is unlocked. (That particular time in which Evans's

PAGE 14 OF ___28___                    AFFIANT'S INITIALS _TM_

safe was unlocked and I missed it is counted in the two times
when his safe was found to be not locked.)

As stated in the above E-mail response to Ellis' inquiry
regarding checking safes, I have been instructed to do spot
checks on the safes. A spot check could occur anytime. The
reason that we do spot checks is to determine if there is a
problem. And there appeared to be a problem with Ellis locking
her safe. And, I do check all safes.


**(6) Computer games.**

On July 7, 2001, during one of my first meetings as the
supervisor for Evans, Keller, and Ellis, among many other topics,
I explained to them that they had and excellent reputation for
handling expedite cases, that is, cases that were priorities and
needed a quick turnaround. However, their reputation for non-
expedite cases was one of laziness and low production. I
informed them that some of the activities by the employees would
have to stop so that production could increase. These activities
included reading newspapers, watching TV, and playing games on
the computer during working hours. I said that I had no problem
if they took three weeks to finish one case if they were
"working" on the case. And that I had every confidence that if
they "work" they will have no problem completing at least the
required minimum of two cases per week, which is what was ordered
by UC Ryan. I also explained that they all receive over $35.00

PAGE 15 OF __28__                      AFFIANT'S INITIALS _TM_

per hour plus benefits to "work" and not to read the newspaper, watch TV, play video games, or procrastinate.

I addressed specific problems with Evans and Keller regarding their work and I informed them that this was an official warning and that if they continued to persist in these actions, I would take administrative action.

I explained to Ellis that I, and others, had seen her playing video games on her computer numerous times and that this was an official warning that, if I saw her playing video games on her computer one more time I would take administrative action. I then instructed her to remove all games from her computer hard drive and any storage disks that she might store games on. This was on July 11, 2001.

In spite of this warning, Ellis continued to play computer games. I provided several additional warnings to no avail. This is documented in her Performance Appraisal Report. In August 2001, I confronted Ellis about the game, which she had minimized on her screen. I asked her repeatedly if that was a game minimized on her computer screen but she refused to answer my question. She proceeded to dismiss me by informing me that she "did not have time for my questions". I considered her defiant attitude and actions of continuing to play video games even after Laboratory Division warnings and my warnings to be insubordinate. I consulted with Section Chief DeVincentis and Unit Chief Ryan about this situation. Given that it was also against security

PAGE 16 OF __28__                      AFFIANT'S INITIALS ᵀᴹ

rules to have unauthorized software on the computer, it was decided that OPR should be informed.  This was my last resort. Additionally, after the above incident, while I was on annual leave, a computer specialist who had been tasked to remove all of the illegal software from Ellis's computer, saw the computer game again minimized on Ellis's computer screen and reported the incident to me.

(7) Subsequent to filing this EEO complaint she received a Does Not Meet Expectations PAR.

Ellis's January 7, 2002, Performance Appraisal Report (PAR) is the only PAR I have written reviewing her performance. I believe that I fully documented the reasons for the summary rating and I believe that it is fair rating.  There was no attempt to retaliate against Ellis for filing an EEO complaint. I believe that my Supervisor Dale Linden mentioned that an EEO complaint had been initiated by Ellis but I do not remember when. I did not know that I would be involved in an investigation until I was advised by the EEO investigator.  These allegations by Ellis are either unfounded or the result of her inability to take responsibility for her actions, lack of production, insubordination, and unprofessional conduct in the work place.  I have given Ms. Ellis numerous opportunities and warnings for her to correct her behavior and perform professionally.  I have not singled Ellis out.  I apply the same principles of supervision to

PAGE 17 OF   28                   AFFIANT'S INITIALS

Ellis, Evans, Keller, and the other employee I supervise, Anita Semper. Please note that Evans and Keller also received a Does Not Meet Expectations PAR for the same rating period that Ellis questions in this action. And that Anita Semper, also a female African-American, received a Does Meet Expectations PAR for that rating period. Ellis's PAR, which I authored, contains many examples of Ellis's failure to perform to the level of her Performance Plan. Let it also be noted that Ellis did request reconsideration from the Performance Recognition and Awards Unit (PRAU) and that PRAU did review all of the information and decided that it would not "adjust" Ellis's PAR and found that the PAR should stand "as is".

(8) 11 expedite cases.

Video Program Manager Dale Linden or his assignee assigns the cases. I do not have immediate knowledge as to how many "specials", or expedite cases Ellis has been assigned for the month in question. Although, that information could be easily recovered from our data base of case work. I do know that it is not rare for a person to "carry" a number of expedite cases from month to month. And to have additional expedite cases assigned to the number carried over. Moreover, as things change with cases, a non-expedite case could be upgraded to an expedite case. Ellis never informed me of an overload of cases and never requested to have any of her cases reassigned due to a heavy case load.

PAGE 18 OF __28__                          AFFIANT'S INITIALS __TM__

**(9) Since filing this complaint she has been threatened with denial of cancellation of leave.**

I have always granted leave to any of the employees that I supervise. There had been problems with Ellis, Evans, and Keller not notifying me, as instructed and required, that they are taking leave. When I started as supervisor this seemed to be a big problem. Again, I believe that since there was little to no supervision in the past, these employees were accustomed to taking leave when they wanted to without pre-approval. And that any supervision was met with indifference or defiance. Since Ellis, Evans, and Keller seemed to have problems with notifying me of their leave, I did inform them that technically, they had to request leave and not "notify me" after the fact. Leave was not automatically granted, although, as I have stated, I have never denied leave. There continued to be problems with them not notifying me of their leave. I again spoke with Janet Cantamesa regarding this problem and she informed me that if they were not responsible enough to notify me of their leave, I should simply charge them with Leave Without Pay (LWOP). I did inform them of this decision.

The one situation described by Ellis happened on a Friday when I had left for the weekend before she did. Ellis put a leave slip on my desk for the following workday, (the Tuesday after a Monday Holiday). Fortunately by coincidence, we both worked unscheduled days the next day, Saturday, and she saw me and asked me if I got her leave slip. I responded that I had and

PAGE 19 OF __28__                    AFFIANT'S INITIALS __TM__

that we would talk about it on the next Wednesday. I did not deny her leave. Had I not come in on that Saturday, I never would have known that she was taking leave on the following Tuesday. On the following Wednesday, I did notify her that leaving a leave slip on my desk after I have left for the weekend did not constitute "pre-approval or advance notice". And that had I not come in on Saturday, I never would have known that she was taking leave on the following Tuesday. I did tell Ellis that all she had to do was notify me. I told her that I had no problem with her calling me at home and in the future she should do that. I again reminded her that leave had to be pre-approved so that we know where employees are and when they will be at work.

In a second situation, Ellis requested leave in the morning for the afternoon of that same day while she was at Quantico. This was a problem because of all of the problems we had earlier regarding spending "an entire day" at Quantico. Countless times either Video Program Manager Dale Linden or I notified Ellis, Evans, and Keller that when they reported to Quantico it should be for the "entire day". I cannot stress enough how many times the Video Examiners were notified that their day at Quantico should be "an entire day". If Ellis could not be at Quantico for an "entire day", then she should reschedule so that when she was there it was for an "entire day". The problem with Ellis's actions on the day in question is that she knew the day before that she had a doctor's appointment the

PAGE 20 OF __28__                              AFFIANT'S INITIALS __TM__

next afternoon, but she did not do, as she had been instructed countless times, and reschedule her day at Quantico, but reported to Quantico and then requested leave for that same day. Please note that I did not deny Ellis leave that day because it was a medical situation, but I did inform her again that she should have rescheduled her "entire day" at Quantico. I discussed this situation with my supervisor, Dale Linden as I had discussed many situations like this one with him and he instructed me to document the situation and get a copy of the doctor's excuse and put it into her file.

(10) A pending OPR investigation was expanded to include that she failed to provide truthful information during an OPR investigation.

I was informed by Unit Chief Ryan that the OPR investigation had been expanded but was not privy to the details.

The EEO Investigator has asked me to address the following by Ellis: It has been very difficult for me to work with Musheno as my supervisor. In July of 2001, he was so verbally confrontational and belligerent that I reported him to Program Manager Dale Linden. I told Linden that I did not appreciate the manner that Musheno spoke to me. Linden said that he would speak with Musheno. Later, Musheno approached

PAGE 21 OF __28__                    AFFIANT'S INITIALS __TM__

me and apologized by explaining that he could sometimes be a
little acerbic and excitable.


Regarding Ellis's statement that "later, Musheno approached
me and apologized by explaining that he could sometimes be a
little acerbic and excitable": I remember apologizing to Ellis,
Evans and Keller after my meeting with them. Even though they
were complimented about various things in that meeting, the shock
of also being criticized appeared to have affected all of them.
I stressed that the problems that they were having were very
serious and that they should take them seriously. I informed
them that their previous supervisor and their Unit Chief had been
reprimanded for things that the Video Examiners were responsible
for and that that was not going to happen on my watch.

It is my understanding from talking with past supervisors
about Ellis that she seems to have a problem working "for" her
superiors. If she is given instructions that she likes or agrees
with, there is no problem. She can be very nice, even affable.
Although she seems to have problems with taking orders that do
not suit her or that she does not agree with. Both Dale Linden
and I have experienced a noticeable shift in attitude and mood
when she does not like an assignment or policy. Additionally,
she does not like to be reminded of assignments or policy. And
she can be very be confrontational or also become reticent. The
reticent attitude can also be a problem, because she does not
communicate when she is having a problem. It has been noted that

PAGE 22 OF   28                           AFFIANT'S INITIALS JM

she has informed PRAU that she does not have a problem working with her superiors although she also states that she has had a problem with her last "four" supervisors. When Ellis calls my actions "so verbally confrontational and belligerent", I believe that she is referring to the first meeting that I had with the Video Examiners. In that meeting I went over a number of things regarding the employees. Considering their history, it was my intention to be honest and fair with the employees, but also stern. One might consider my approach rather sobering to employees who have not been actively supervised for a number of years. But it is also very honest and informative. I spoke with my supervisor, Dale Linden, regarding this meeting prior to it and he agreed that the information that I had planned to address was appropriate. He agreed that it might be considered "harsh" but these employees needed to be informed of the situation as management saw it. After all, these were all GS-13 Video Examiners each with around twenty years of experience with the Bureau. During the meeting, in addition to other topics, I did the following:

-reviewed case stats with each Video Examiner regarding number of cases they completed in the last five and one half years and the "old" cases they still have on the books. Their stats in comparison with other Video Examiners with the same responsibilities were not acceptable.

PAGE 23 OF __28__                          AFFIANT'S INITIALS TM

-stressed that I know there have been "management" or "lack of management" issues in the past. And that this might be a reason that their completed case statistics are considerably lower than other Video Examiners in the unit that do the same job.

-complimented all of the Video Examiners, Ellis included, on doing expedite and high profile cases. I told them that they had a great reputation within the Bureau for doing well "on the expedite and high profile cases".

-mentioned that in the past all of the Video Examiners have helped me personally with some of my expedite cases and that they did a great job.

-did explain to them that their reputation within the Bureau regarding routine cases was that of being very lazy. Two examples of that laziness were, not returning phone calls regarding the status of cases, and taking an extremely long time to finish cases. I explained that I had heard this from other examiners, including unit chiefs, former supervisors, and co-workers.

-explained that a big part of the problem with the lack of production was their idea of "work". I also explained that they all receive over $35.00 per hour plus benefits to "work" and not to read the newspaper, watch TV, or play video games.

-explained to Keller that this was an official warning and that

PAGE 24 OF __28__                    AFFIANT'S INITIALS ᴍ

if I saw him reading the newspaper beyond a "reasonable" amount
of break time, I would write him up.

-explained to Evans that the reason that he was written up by the
section chief was not for his actions regarding a San Diego case
but because he procrastinated when requested to respond in
writing to an inquiry from his supervisor, unit chief and section
chief.  I encouraged him, that in the future, if he is requested
by his supervisor, unit chief, or section chief to provide in
writing something by COB the next day, it would behoove him to do
just that.

-explained to Ellis that this was an official warning and that if
I saw her playing video games on her computer one more time I
would take administrative action.  I reminded her that the video
games were illegal to have on her computer and instructed her to
remove all games from her computer hard drive and any storage
disks that she might store games on.

-explained that I had every confidence in their abilities to do a
good job and at a minimum that they should be able to finish at
least two cases per week.  I then reminded them that Keller had
just had a month where he finished 20 cases, that is **five** cases
per week.


The EEO Investigator also asked me to comment of the following by

**Ellis:**   . . . on June 27, 2002, Musheno had to apologize to me
again.  He admitted that he had overreacted when he
challenged me on why I needed another examiner to help me
retrieve and carry some video equipment from the Director's
Dining room.

It is true that I did apologize for reprimanding Ellis
for not getting permission in the first place to have Evans help
her.  I did make that mistake, she did in fact get that
permission.  The permission **had** been granted by my supervisor
Dale Linden and I misunderstood the situation.  I did apologize
for reprimanding her for that.  However, I did **not** apologize for
reprimanding her for requesting Evans's help to move equipment (a
push cart and a video camera).  This equipment, by Ellis's own
admission could have been moved easily in two trips by herself in
minutes.  This should not have required two GS-13 examiners to
move the equipment.  Ellis did not need assistance in performing
this task.  And there was no request from the Director's Office
to move the equipment immediately.

I fail to see why Ellis believes that she is being
discriminated against because she is an African-American woman.

I also supervise another African-American woman who is an excellent employee. Ellis's race and gender had no impact on my actions or deliberations. Ellis's own actions, lack of production, defiance, and insubordination, all of which are documented, are the reasons actions have been taken against this employee. I think it is unfair that she has accused me and my superiors of gender and racial discrimination. This is a very serious charge and I do not take it lightly.

I believe the accusations by Ellis as listed above are not the result of discrimination, but rather a result of her frustration with a new management that is concerned with "managing" and making its employees responsible for their actions. As a GS-13 employee, she has exhibited behavior and conduct that is irresponsible and unprofessional and she has been called on it. I believe that "any" management in Ellis's eyes might be considered "over" management.

I do not have any knowledge of any additional information that I believe is relevant to the scope of the inquiry as described to me by SSA GRACIA.

I have read this statement consisting of this and twenty-seven other pages. The entire document is true and complete to the best of my knowledge and belief. I understand that the

PAGE 27 OF __28__                    AFFIANT'S INITIALS _TM_

information I am giving is not to be considered confidential and that it may be shown to interested parties.

_____
THOMAS MUSHENO

        Sworn to and subscribed before me at Washington, D.C., on this _15TH_ day of AUGUST , 2002.

_____
JULIO GRACIA
Supervisory Special Agent
EEO Investigator

PAGE 28 OF __28__

AFFIANT'S INITIALS _JM_