WASHINGTON, D.C.

## SWORN STATEMENT

I, Philip N. Williams, GS-13/10, Information Technology Specialist (Systems Analyst), Training Unit, Laboratory Division, Quantico, Virginia, Federal Bureau of Investigation (FBI) do hereby solemnly swear:

I have been advised by Supervisory Special Agent (SSA) Julio Gracia of the Office of Equal Employment Opportunity Affairs, FBI, that he is investigating a complaint of employment discrimination (F-03-5742) pursuant to Title 29 of the Code of Federal Regulations, Part 1614.

I understand that the issue under investigation is whether Merinda Ellis Evans was discriminated against based on RACE (BLACK), SEX (FEMALE), and REPRISAL for her prior participation in EEO protected activity when:

1) On or about October 30, 2002, Evans was demoted from forensics examiner to an undetermined status and her duties were reassigned;

2) On November 20, 2002, Evans received a "Does Not Meet Expectations" rating in one critical element of her Performance Appraisal Report (PAR);

3) On or about November 20, 2002, Evans was advised that she would be required to report to work at the FBI facility in Quantico, Virginia; and

4) Evans was terminated from employment with the Federal Bureau of Investigation on February 14, 2003.

PAGE 1 OF __12__                                   AFFIANT'S INITIALS _____

**BACKGROUND**

ENTERED ON DUTY:   August 23, 1993

RACE:   Caucasian.

SEX:   Male.

**DETAILS**

1. **On or about October 30, 2002, Evans was demoted from forensics examiner to an undetermined status and her duties were reassigned.**

   While I have no direct knowledge of the details surrounding Ms. Evans demotion, the facts of which I am aware, are not consistent with treatment I received when Forensic Audio Video Image Analysis Unit (FAVIAU) management discovered that I was meeting with OPR, the Ombudsmen office, The Office of the Inspector General, and was seeking employment outside the Unit. I was not yet an examiner, but I was relieved of forensic duties, all Forensic training opportunities were retracted, and my cases were reassigned.  In my case there was no demotion, but there was increased pressure to produce documentation for forensic techniques I had developed.

2. **On November 20, 2002, Evans received a "Does Not Meet Expectations" rating in one critical element of her Performance Appraisal Report (PAR).**

   While I have no detailed knowledge of Ms. Evans's PAR, those facts of which I am aware indicate to me that her treatment

PAGE 2 OF __12__                              AFFIANT'S INITIALS  /w/

was consistent with treatment I received from FAVIAU management in the following sense. In my case the PAR was based on elements outside the performance period, contained a running personal commentary rather than appropriate performance measures, and was based on largely falsified documentation. However, in my case I did not receive the PAR until I had already established a TDY position in another Unit. In fact my PAR was delivered to me in early January. This prevented FAVIAU from obstructing my TDY based on poor performance.

During the delivery of my 2001 PAR I suggested that it would be to the benefit of all involved if FAVIAU management did not further attempt to obstruct my departure from the unit. I was told that by my supervisor at the time, Richard Vorder Bruegge, that management had a "Great deal of admiration for my decision to leave the unit as 'others' had not gotten the message."

It was clear to me during the discussion that the "others" reference specifically related to Ms. Evans and two other FBIHQ employees. It was known by my management that I had filed a complaint with OPR related to my treatment in the Unit. While it is possible that there is no relationship between my filing of the OPR complaint and subsequent actions taken by FAVIAU management, the timing and flow of events would make it unlikely that these events were unconnected.

It is my belief that Ms. Evans was subjected to similar treatment for her involvement with the EEO office. The timing in

PAGE 3 OF __12__                                    AFFIANT'S INITIALS _____

her case is equally suspicious to me as an observer.

3. **On or about November 20, 2002, Evans was advised that she would be required to report to work at the FBI facility in Quantico, Virginia.**

I have no specific knowledge of the events surrounding Ms. Evans relocation, except that many general statements were made by FAVIAU management to me concerning "problems" with FBIHQ video examiners. These references were frequent. In fact on May 16, 2001, I received an e-mail from Unit Chief Ryan, referencing performance concerns based on a complaint he had received relating to a case.

In this e-mail UC Ryan demanded that Program Manager Dale Linden "make sure that Phil gets these cases done on time." The fact is that the situation referenced by UC Ryan did not involve me, it was related to a case worked at FAVIAU-FBIHQ. In subsequent conversations on this subject PM Linden implied that he was not certain who the examiner was on the case, but he was certain "it must be either Ron or Merinda." How he could be certain of this and yet not know who the examiner was, struck me as unusual at the time.

4) **Evans was terminated from employment with the Federal Bureau of Investigation on February 14, 2003.**

At the time of Ms. Evans dismissal, I was working with my management in the Training Unit, to create a TDY opportunity

PAGE 4 OF __12__                                    AFFIANT'S INITIALS /w/

for her in my unit. Based on my knowledge of Ms. Evans KSAs, the nature of the video work in T.U. is a perfect match. The Ombudsmen Office was involved in the process.

Ms. Evans termination was a surprise and shock to my management. It was generally understood that any TDY would have produced a remediation opportunity for Ms. Evans, thus recovering a valuable skill set for application to the mission of the Bureau. Rather than allow Ms Evans to persue this opertunity, FAVIAU management proceeded with termination.

### Background information

I would offer the following information related to the general environment in the Forensic Audio Video Image Analysis Unit (FAVIAU) and how my experiences and treatment might have differed from that of Ms. Evans (NEE: Ellis) and others. It is important to note that I left FAVIAU January 1, 2002 on TDY, and subsequently transferred to the Laboratory Training Unit (T.U.) effective April 14, 2003. I have stayed in touch with many individuals in FAVIAU, including Ms. Evans. However, my observations are my own and I relate them here so that the reader may better understand my experience and FAVIAU itself. In my view there were problems in FAVIAU that while subtle, are reflected in the general composition and ethnic makeup of the unit. The Unit is substantially comprised of three major components. The Audio program, the Video Program, and the Evidence room.

PAGE 5 OF __12__                                    AFFIANT'S INITIALS /pw/

Until recently the evidence room was staffed entirely by Caucasian female employees. With the retirement of Ms. Patricia Coneheim in 2002, Mr Barry King was appointed supervisor of this program. To my knowledge the remainder of the employees are still Caucasian females.

The Audio program is managed by a Caucasian male and staffed primarily by Caucasian males. The exceptions are one Asian male Mr. Hirotaka Nakasone, one Caucasian women Ms. Barbra Snyder, and one African American women Ms. Artise Savoy Kelly. It has been my observation that while Mr. Nakasone and Ms Snyder receive case assignments generally similar to other employees in the unit, Ms Kelly does not receive any case assignments that might require court room testimony. It should be noted that Ms. Kelly is an EAP representative.

Until late 2000, the video program was also staffed largely by Caucasian males. The exceptions included one Caucasian female, Ms. Holly Breault, a second Caucasian female, Ms. Marla Carroll, and one African American Male, Mr. Ervin Tony. In late 2000 a laboratory realignment, placed Mr. Ron Evans, an African American male, and Ms Merinda Ellis (now Evans), an African American Female into the program.

(Note: Ms. Carroll arrived in the FAVIAU in March 2000 and left the Bureau in November of 2000. She was certified as an examiner within that time frame. Typically FAVIAU examiner certification takes two to three years. This episode was disruptive and obvious to many in the unit as the time period

PAGE 6 OF __12__                              AFFIANT'S INITIALS __/__

involved did not even represent a full performance review cycle. In addition Ms. Carroll was encouraged by Mr. Linden to submit Compensatory Time requests to supplement her accrual of leave.)

At one point I had a discussion with UC Ryan concerning my observation that the unit might have ethnic balance issues in light of the ethnic makeup of the Washington, DC, metropolitan area. This discussion was prompted by a recruitment effort sponsored by FAVIAU management were recruiters were to be sent to a number of university career day events. I noted that FAVIAU planed to send recruiters to Miami, Gainesville, Boston, and UVA to recruit Audio examiners. I pointed out to UC Ryan that Howard University was right here in DC and that they had an active audio department. In addition Howard was sponsoring a "Career day" just three weeks hence. I noted to UC Ryan that because these students were local, they could be brought in immediately with little delay or cost to the government.

UC Ryan became terse, and advised that recruitment was his problem. He further advised that he did not appreciate my observations of Unit ethnic makeup or recruitment practices, and that he wanted no further interference from me in these areas. When I again suggested we would be overlooking many qualified candidates if we did not look at Howard, UC Ryan advised that "Those are not the kind of people we are looking for."

It was obvious to me that this reference had nothing to do with the technical qualifications of Howard University students. It was clearly a reference to the ethnic character and

PAGE 7 OF  12                           AFFIANT'S INITIALS

makeup of the student body itself. I was shocked by this reaction and still find the matter distasteful. However it was made clear that the subject was not to be brought up to UC Ryan again.

My observations of the video program seemed to indicate a range of inconsistences in the treatment of employees both preferential and detrimental. In addition to the apparent "special" treatment provided to Ms. Carroll noted above, during normal working hours Ms. Breault was frequently not at her workstation, and was apparently not within the unit space. When she was actively working a case the video program manager, Mr Dale Linden, would frequently sit beside her for hours as she worked. Ms. Breault was frequently authorized to work evenings and weekends. Mr. Linden frequently stated to me that he had assisted Ms Breault on many weekends.

On a number of occasions both Mr. Linden and Mr. Ryan expressed dissatisfaction with FAVIAU employees at FBIHQ. In particular they were dissatisfied with what they termed "Quality" issues. There was frequent mention of shortcomings in the training of FBIHQ examiners which included Ms. Evans.

I observed many incidents of subtle racial bias during my tenure in FAVIAU. While rarely aimed at any specific individual, in my opinion this atmosphere permeated many management decisions, and daily Unit activities. While it is true that my background as an EEO representative for my division when employed at EPA may have produced a heightened awareness of

PAGE 8 OF __12__                              AFFIANT'S INITIALS _PW_

these issues, it is also true that others have noticed problems within FAVIAU as well. Many of these individuals are afraid to come forward with these concerns, in some cases this is because they do not wish to deal with possible reprisal from FAVIAU management, in others it is because they do not see the issue as a problem for them personally.

Not withstanding the details or inaccuracy of performance accusations made by FAVIAU managers, in aggregate, my situation did not differ in significant ways from that of Ms. Evans. The facts are these;

1)   Both Ms. Evans and I were relieved of Forensic duties without benefit of a performance review.

2)   Both Ms. Evans and I were reassigned to tasks below our grade within FAVIAU.

3)   Both Ms. Evans and I were given a "Does not meet expectations" PAR only after reassignment.

4)   Both Ms. Evans and I were actively seeking employment outside the unit prior to these management actions.

5)   Both Ms. Evans and I sought assistance from the Ombudsmen office, EAP and other Bureau sponsored protected programs.

6)   Both Ms. Evans and I discussed the matter with the Office of Professional Responsibility.

7)   Both Ms. Evans and I appealed the PAR and were (in my opinion) denied a fair hearing due to the "presumption of truthfulness" doctrine applied by PRAU when reviewing management

supplied information.

8) Neither Ms. Evans or I had never received a poor performance rating in over 20 years of Federal service.

9) Neither Ms. Evans or I received any council, guidance, or complaints concerning our performance from FAVIAU management prior to being relieved of duty. Neither of us was provided an opportunity period prior to being relieved of duty as required at that time by PRAU regulations.

10) Both Ms. Evans and I have had health problems that at first seemed to be accommodated by FAVIAU management, but these accommodations subsequently became the basis for management actions against us.

11) Both Ms. Evans and I had located other Units which actively participated in producing a TDY opportunity.

12) FAVIAU management filed OPR complaints against both Ms. Evans and myself, involving issues that are typically handled as either performance or supervisory matters. In my case other Unit employees who I now know were never interviewed during the investigation, were aware of this investigation. It is my opinion that FAVIAU management "leaked" this information to other Unit employees. This also appears to have been the case in Ms. Evans situation as well.

In addition to these similarities, there are a number of surprising differences between Ms Evans treatment and my own.

1) Not only was I allowed to leave the unit, but FAVIAU management allowed transfer of the position to T.U. as well so as

PAGE 10 OF __12__                           AFFIANT'S INITIALS

to facilitate my move.

2) After I announced I was leaving not only was all further pressure stopped, but I was actually praised for "Taking the hint."

3) My TDY to T.U. was used by FAVIAU as an "opportunity period" to satisfy the PRAU requirements that this be done prior to a change in duty assignments.

4) PRAU determined that they would not stop my TDY and subsequent transfer, despite the fact that both of these procedures violated PRAU and OPR policy.

5) My TDY expired after 6 months, yet FAVIAU made no attempt to have me return or continue to be involved in my management oversight.

From my perspective it is difficult to draw any conclusion in contrasting my treatment with Ms. Evans beyond the obvious. She had filed an EEO complaint based on her treatment in FAVIAU before action was taken for her removal. In my case, I had filed a complaint with OPR. As far as I can tell my complaint was quashed within OPR, and no action was taken. In Ms. Evans case an investigation was opened.

I do not have any knowledge of any additional information that I believe is relevant to the scope of the inquiry as described to me by SSA GRACIA.

I have read this statement consisting of 12 pages. The entire document is true and complete to the best of my knowledge

PAGE 11 OF __12__                                   AFFIANT'S INITIALS _____

and belief. I understand that the information I am giving is not to be considered confidential and that it may be shown to interested parties.

This interview is the result of a telephonic contact conducted by SSA Gracia on May 8, 2003.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on _June 9_, 2003.

_____
Philip N. Williams

PAGE 12 OF __12__          AFFIANT'S INITIALS _PW_