**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MERINDA ELLIS EVANS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1063 (GK) |
| | ) | |
| ERIC H. HOLDER, | ) | |
| United States Attorney | ) | |
| General,[1] | ) | |
| | ) | |
| Defendant. | ) | |
|  | ) | |

**<u>MEMORANDUM OPINION</u>**

Plaintiff Merinda Ellis Evans ("Plaintiff" or "Ellis Evans"),[2] a Video Communications Specialist ("VCS") at the Federal Bureau of Investigation ("FBI"), brings this action against Eric H. Holder, Attorney General of the United States ("Defendant" or "Government"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"). Plaintiff seeks (1) a determination that Defendant  violated Title VII, (2) an injunction preventing Defendant from "continuing any and all discriminatory practices," (3) damages of more than $300,000, and (4) reasonable attorney's fees, costs, and expenses.

---

[1]     Former Attorney General Alberto Gonzalez was named as the original lead respondent in this case.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court automatically substitutes the current Attorney General, Eric H. Holder, as the new lead respondent.

[2]     In some of the materials submitted in this case, Plaintiff is referred to by her birth name, "Merinda Ellis."

This matter is now before the Court on Defendant's Motion for Summary Judgment [Dkt. No. 47].  Upon consideration of the Motion, Opposition, Reply, the entire record herein, and for the reasons stated below, Defendant's Motion is **granted**.  An Order shall accompany this Memorandum Opinion.

I.    **BACKGROUND**[3]

Plaintiff worked as a GS-13 VCS at the FBI.  After February 13, 2000, she was assigned to the FBI's Forensic Audio Video and Image Analysis Unit ("FAVIAU") at the FBI Headquarters in Washington, D.C.  Two of her coworkers, Ronald Evans ("Evans") and Robert Keller ("Keller"), were also assigned to FAVIAU during this period.  Evans is an African American male, who is also the husband of Ellis Evans.  Keller is a Caucasian male.

The VCSs had four supervisors.  In descending order, they were Section Chief Keith DeVincentis ("DeVincentis"), Program Manager Dale Linden ("Linden"), Unit Chief John James Ryan ("Ryan"), and Thomas Musheno ("Musheno").  Musheno was the immediate supervisor of the VCSs, a position he assumed in June 2001.  Prior to Musheno, their immediate supervisor was David Bonner.

In January 2001, Plaintiff requested permission from Ryan to attend a DVD technology training in February 2001.  Ryan denied her

---

[3]     Unless otherwise noted, the facts set forth herein are undisputed and drawn from the parties' Statements of Undisputed Material Facts submitted pursuant to Local Civil Rule 7(h) and the parties' summary judgment papers.

permission to attend the training, but Plaintiff attended a DVD training given in May 2001.

On March 15, 2001, Plaintiff, Evans, and Keller met with DeVincentis to discuss their grievances with management.  Def.'s Mot. at 4.  As a result of this meeting, DeVincentis and Ryan decided that the VCSs could benefit from working with the other unit personnel who were based in Quantico.  Id.  As of March 21, 2001, all three VCSs were required to report to Quantico one day per week.  In addition, beginning in March 2001, all three were supervised more closely by their supervisors.  Pl.'s Opp'n at 7.

In June 2001, a notice requiring the employees to lock their safes at the end of each day was posted on the exit doors in the Unit.  In spite of this sign, Plaintiff left her safe unlocked on four occasions between August 21, 2001 and November 18, 2001.  Def.'s State. of Mat. Facts, ¶ 14 (p. 3).  Musheno discovered her safe unlocked once, but never found that Keller had left his safe unlocked.  Id.

On an unidentified date sometime after July 11, 2001, Plaintiff played a video game on her work computer.  Such activity was prohibited by FBI computer security requirements.  Def.'s State. of Mat. Facts, ¶ 31 (p. 4).  When Musheno saw that the game was minimized on her computer screen, he inquired about it.  Plaintiff responded that she "could not tell him what he was seeing with his eyes."  Def.'s Reply, Ex. 1.  In August 2001, Musheno

-3-

reported Plaintiff to the FBI's Office of Professional Responsibility ("OPR").  The OPR then initiated an investigation into whether she had used unauthorized video software on her computer.

On October 18, 2001, Plaintiff returned evidence from Quantico to the FBI Headquarters.  Although she claimed two hours of compensatory leave for the trip, she was awarded only one.  On October 29, 2001, Linden informed Plaintiff that she would not receive compensatory time for transporting evidence to and from FBI Headquarters.

On October 30, 2001, Plaintiff informed Ryan that she would not make the required weekly trips to Quantico until she could meet with the Ombusdman.

On December 3, 2001, Plaintiff was notified that the OPR had initiated an investigation into allegations of insubordination and inappropriate use of her work computer.

On January 7, 2002, all three VCS employees -- Plaintiff, Keller, and Evans -- received "Does Not Meet Expectations" summary ratings in their Performance Appraisal Reports ("PARs").  Although Plaintiff received an overall rating of "Does Not Meet Expectations," she received a "Meets Expectations" score in four of the seven individual categories:  using computers to perform work; acquiring, applying, and sharing job knowledge; researching and analyzing; and designing and processing media products.  She

-4-

received a "Does Not Meet Expectations" in three individual categories:  organizing, planning, and coordinating; relating with others and providing professional service; and maintaining high professional standards.

Prior to receiving this PAR, Keller had trouble completing cases in a timely fashion.  As a result, his caseload was severely backlogged.  On January 8, 2002, all three VCSs were notified that they would have ninety days to raise their performance to the "Meets Expectations" level.  The FBI refers to this ninety-day period as a Performance Improvement Period ("PIP").

On April 8, 2002, the PIP concluded, and Plaintiff received a "Meets Expectation" rating for the PIP period.  However, on April 19, 2002, Plaintiff failed to document information in her notes that was reported in the Results of Examination Report, and on July 11, 2002, Plaintiff failed to label original evidence in two cases and failed to document information in a third.[4]

---

[4]     Plaintiff's response to these two allegations only states that they are "not accurate as these issues were most likely corrected during the administrative review process" and because "[c]urrent file auditing policies . . . that have found similar omissions and errors have not affected examiners [sic] performance appraisals."  Plaintiff's Response to Defendant's Statement of Material Facts Not in Dispute at ¶¶ 27, 29.  Whether the errors were corrected later in the review process and whether they had an undue impact on a performance appraisal has no relationship to the question of whether the underlying facts alleged by Defendants are accurate.  What is relevant is that neither of Plaintiff's arguments disputes the underlying facts.

On July 12, 2002, during her mid-period PAR annual review, Plaintiff had failed to meet production expectations because she completed only thirty out of forty-three cases that were assigned to her.  Three days later, on July 15, 2002, the OPR found that Plaintiff was insubordinate and violated FBI computer security requirements by installing video games on her work computer. Plaintiff received a ten-day suspension as punishment.  She served this suspension between October 26, 2002 and November 5, 2002.

On August 6, 2002, Ryan directed Linden and Musheno to monitor Plaintiff's performance closely and directed Barbara Snyder, a Quality Assurance Manager, to provide Plaintiff with quality assurance training.

On an unspecified date on or about August 13, 2002, Plaintiff received an "expedite" case.  The case requested copies and still photographs from a videotape by August 26, 2002.  Plaintiff did not meet this deadline.  She received an extension until mid-September.

In mid-September, because she played the digital tape on an analog player, Plaintiff mistakenly stated that the tape had nothing on it.  Plaintiff eventually completed the copies on September 3, 2002 and the prints on September 13, 2002.

On October 25, 2002, Linden conducted an audit of Plaintiff's cases.  He reviewed five randomly selected cases from her caseload and found errors in each one.

On November 6, 2002, Plaintiff was relieved of her duties as a forensic examiner.  On November 15, 2002, she was assigned other responsibilities and was informed that she would be required to report to Quantico for the week of December 9, 2002.

Five days later, on November 20, 2002, Plaintiff received her annual end of year PAR.  She received a summary rating of "Does Not Meet Expectations."  She received a rating of "Meets Expectations" in six out of the seven individual categories.  P's Opp'n, Ex. M She received a "Does Not Meet Expectations" rating in the "maintaining high professional standards" category.  Id.

On December 31, 2002, the FBI recommended dismissing Plaintiff after considering and rejecting the alternatives of reassignment and reduction in grade.  On February 11, 2003, the FBI ordered that Plaintiff be removed.

Plaintiff first contacted an EEO counselor on December 5, 2001.  She filed a formal EEO complaint with the FBI on December 21, 2001.  Def's Mot., Ex. 5  She sought EEO counseling on November 13, 2002 and filed her second formal EEO complaint on January 6, 2003.

The EEOC consolidated Plaintiff's two administrative complaints.  Def's State. of Mat. Facts, ¶ 44.  On January 30, 2005, Plaintiff gave notice that she intended to file a civil action in federal court and requested dismissal of the EEOC administrative proceedings.  On February 7, 2005, the EEOC granted

-7-

this request.   However, since no civil action had been filed by April 4, 2005, the FBI EEO office forwarded the complaint to the Complaint Adjudication Office (CAO) at the Department of Justice.

The CAO issued a final agency decision on November 5, 2005. It found that the Government had neither discriminated nor retaliated against Plaintiff.

Plaintiff filed a Complaint in this Court on May 26, 2005, and an Amended Complaint on September 16, 2008 [Dkt. No. 39].

## II.  STANDARD OF REVIEW

Summary judgment may be granted "only if" the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.   See Fed. R. Civ. P. 56(c), as amended December 1, 2007; Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006).   In other words, the moving party must satisfy two requirements:   first, demonstrate that there is no "genuine" factual dispute and, second, that if there is it is "material" to the case.   "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"   Arrington, (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).   A fact is "material" if it might affect the outcome of the case under the substantive governing law.   Liberty Lobby, 477 U.S. at 248.

In its most recent discussion of summary judgment, in <u>Scott v.</u> <u>Harris</u>, 550 U.S. 372, 380 (2007), the Supreme Court said,

> [a]s we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Industrial Co. v.</u> <u>Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 . . . (1986) (footnote omitted).   "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Liberty Lobby</u>, 477 U.S. at 247-48.

However, the Supreme Court has also consistently emphasized that "at the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." <u>Liberty Lobby</u>, 477 U.S. at 248, 249.   In both <u>Liberty Lobby</u> and <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 150 (2000), the Supreme Court cautioned that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge" deciding a motion for summary judgment. <u>Liberty Lobby</u>, 477 U.S. at 255.   In assessing a motion for summary judgment and reviewing the evidence the parties claim they will present, "the Court must draw all reasonable inferences in favor of the non-moving party." <u>Reeves</u>, 530 U.S. at 150.   "To survive a motion for summary judgment, the party bearing the burden of proof at trial

-9-

. . . must provide evidence showing that there is a triable issue as to an element essential to that party's claim. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)." <u>Arrington</u>, 473 F.3d at 335.

## III. **ANALYSIS**

Discrimination claims pursuant to Title VII are analyzed under the <u>McDonnell Douglas</u> burden shifting framework. <u>Reeves</u>, 530 U.S. at 142 (applying the framework to a claim brought under the Age Discrimination in Employment Act); <u>Ginger v. District of Columbia</u>, 527 F.3d 1340, 1344 (D.C. Cir. 2008); <u>see</u> <u>Hawkins v. Holder</u>, 597 F. Supp. 2d 4, 16-17 (D.D.C. 2009).

Our Court of Appeals recently held that, when considering a motion for summary judgment in an employment discrimination case, a district court need not consider whether a plaintiff has actually satisfied the elements of a prima facie case if the defendant has offered a legitimate, non-discriminatory reason for its actions. <u>Brady v. Office of the Sergeant at Arms</u>, 520 F.3d 490, 494 (D.C. Cir. 2008).

Instead, "the district court must resolve one central question: has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason for the adverse employment actions, and that the employer's actions were discriminatory." <u>Id.</u>  In other words, a court must determine

whether "all the evidence, taken together, was insufficient to support a reasonable inference of discrimination." Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009) (citing Brady, 520 F.3d at 494-495); see also Holcomb v. Powell, 433 F.3d 889, 896-97 (D.C. Cir. 2006) ("[T]he plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason.")(quoting Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003)).

Our Court of Appeals has explained that "all of the evidence" means "any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." Holcomb, 433 F.3d at 897 (citing Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)).  It has also emphasized that it has "consistently declined to serve as a super-personnel department that reexamines an entity's business decisions." Holcomb, 433 F.3d at 897 (internal citations and quotation marks omitted).

A plaintiff may show discrimination either directly or indirectly. Id. (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)); see also Hawkins, 597 F. Supp. 2d at 17. Evidence is direct if it shows that a "discriminatory reason more

likely motivated the employer." <u>George v. Leavitt</u>, 407 F.3d 405, 413 (D.C. Cir. 2005) (internal citations omitted).  Evidence is indirect if it shows that "the employer's proffered explanation is unworthy of credence."  <u>Id.</u>

In this case, Plaintiff presents no direct evidence of discrimination, and she concedes that there were several instances in which she performed poorly at work.  Instead she argues that the Government's nondiscriminatory explanation is a pretext because two other employees performed at least as poorly as she did but were treated favorably.

### A.   All Claims Based on Discrete Acts Occurring Prior to October 19, 2001 Are Time-Barred

Defendant argues that four of Plaintiff's claims were not timely exhausted and are therefore time-barred: (1) the denial of compensatory leave, (2) the intensified monitoring of Plaintiff's work after March 15, 2001, (3) the denial of training in February 2001, and (4) the requirement to report for weekly file reviews at Quantico.

An aggrieved employee must consult an EEO Counselor within forty-five days of the alleged discriminatory action or, in the case of a personnel action, within forty-five days of the effective date of this action.  29 C.F.R. § 1614.105(a)(1).  Plaintiff first contacted an EEO counselor on December 5, 2001.  Thus, all claims based on discrete acts occurring prior to October 19, 2001 are time-barred.

Plaintiff argues that her claims are not time-barred because "Defendant's illegal activities were a continuing violation since the bulk of the discriminatory conduct allege [sic] in Plaintiff's EEO complaint are discrete acts that occurred during the requisite filing period of October 19, 2001." Pl.'s Mot. at 11.

The Supreme Court has ruled that if a plaintiff's claims are discrete acts, then they are time-barred unless they fall within the forty-five day period. See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002). Unlike claims based on discrete acts, claims based on continuing violations are not subject to this forty-five day period. To be considered a continuing violation, a plaintiff must show the "cumulative effect of individual acts." Id. at 115.

Plaintiff misstates the law in two respects. First, she argues that Defendant's conduct was a continuing violation at the same time as she argues that the acts were discrete. She cannot have it both ways. The Defendant's conduct was or was not a continuing violation, and different legal consequences flow from that difference.

Second, Plaintiff has offered nothing more than conclusory statements to establish that the alleged acts of discrimination had a "cumulative effect." See Pl.'s Mot. at 12 (arguing that "Plaintiff has asserted a hostile work environment claim" despite the fact that the Amended Complaint neither includes the term

"hostile work environment" nor contains facts to support such an allegation).  In the absence of evidence to support her argument that there was a continuing violation, Plaintiff fails to raise a genuine issue of material fact on this issue.

For these reasons, Plaintiff failed to timely exhaust her administrative remedies for these four claims.

### B. No Reasonable Juror Could Find for Plaintiff Because the Undisputed Facts Show that the Government Had a Legitimate, Nondiscriminatory Reason for Its Actions

As our Court of Appeals has stated, "[t]he ultimate question is whether intentional discrimination may be inferred from all the evidence before the trier of fact."  Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1154 (D.C. Cir. 2004) (quoted in George v. Leavitt, 407 F.3d at 412) (internal punctuation omitted).

Here, Plaintiff has not disputed twelve material facts.  She has not disputed that (1) she played video games on her FBI computer, in violation of FBI policy; (2) her supervisor reported her to the OPR for "unauthorized video software on her FBI computer"; (3) she left her safe unlocked on four occasions; (4) Musheno found her safe unlocked once; (5) she claimed two hours of compensatory leave for October 18, 2001 but was awarded only one hour; (6) during her mid-period review, she completed only thirty out of forty-three required cases; (7) the OPR found that Plaintiff was insubordinate and violated FBI computer security requirements by installing video game software on her FBI computer; (8) she

received an "expedite" case request on August 13, 2002, failed to meet the August 26, 2002 deadline, and then when she did complete the work, made a significant error; (9) when the FBI audited five randomly selected cases from Plaintiff's caseload on October 25, 2002, it discovered "errors, inaccuracies, and documentation issues" in each case, (10) she attended a May 2001 training when her supervisor had denied her permission to attend the same training in February 2001; (11) she twice failed to document information in her notes, and (12) she twice failed to properly label evidence. See generally Pl.'s Response to Def.'s Statement of Material Facts As To Which There Is No Genuine Dispute. Because Plaintiff failed to dispute these twelve assertions, the Court may treat them as conceded. See Twelve John Does v. District of Columbia, 117 F.3d 571, 577 (D.C. Cir. 1997); Malik v. District of Columbia, 538 F. Supp. 2d 50, 52-53 (D.D.C. 2008); Buggs v. Powell, 293 F. Supp.2d 135, 141 (D.D.C. 2003); LCvR 7(h).

On their face, these undisputed facts offer overwhelming evidence to support Defendant's nondiscriminatory explanation of its actions. Each of these facts reveals a serious flaw in Plaintiff's performance. Plaintiff's decision to load personal video games on her computer at work threatened the security of the FBI's computer network. Playing them during work hours in disregard of FBI policy, especially in view of her substantial backlog of cases is both an act of open defiance, and an act that

threatened to impede FBI investigations throughout the country.  It was serious enough to warrant an OPR investigation and serious enough for the OPR to find Plaintiff responsible for insubordination and for violating FBI security policy.

Other conceded facts illuminate similarly troubling aspects of Plaintiff's performance.  Although she worked in an office that depends upon maintaining a secure facility and although signs were posted to remind employees to lock their safes at night, Plaintiff left hers unlocked on four different occasions.  Plaintiff undermined her relationship with her supervisors when she lied to them and claimed more compensatory time than she deserved.  In a job in which the nation's law enforcement officials depended upon her for timely completion of projects, she delayed and mishandled a case that she was requested to expedite.  When a random sampling of her work was reviewed, each item suffered from errors.  She ignored the instructions of a supervisor by attending a training even after he had denied her permission to do so.  She failed to document changes and other information and twice failed to label evidence.

In the aggregate, these conceded facts present a compelling picture of Plaintiff's inability -- or refusal -- to perform her job competently and professionally.  Moreover, they present a compelling, legitimate, and nondiscriminatory reason for terminating her.  The large volume of evidence detailing

Plaintiff's significant performance problems overwhelmingly supports the Government's claim that its actions were the result of Plaintiff's performance and not discrimination.

For these reasons, Plaintiff has presented no direct evidence that would allow a reasonable juror to conclude that Defendant discriminated against Plaintiff.[5]

### C. Plaintiff Has Not Shown that a Similarly Situated Employee Was Treated Favorably

In the absence of direct evidence that the Government discriminated against Plaintiff, she attempts to use indirect evidence to prove that the Government's nondiscriminatory reason was a pretext. There are two ways to demonstrate that the nondiscriminatory explanation was false. First, a plaintiff may show that "the employer is making up or lying about the underlying facts that formed the predicate for the employment decision." Brady, 520 F.3d at 495 (internal citations omitted). Second, a plaintiff may show that a similarly situated employee was treated favorably. Brady, 520 F.3d at 495.

Here, Plaintiff adopts the latter approach. She argues that the Government's actions were discriminatory because Keller and Philip Williams ("Williams") were similarly situated to Plaintiff but received favorable treatment.

---

[5] The Government has also alleged that five of Plaintiff's claims are based on actions that are not adverse. Because its Motion may be granted on other grounds, it is not necessary to examine this issue here.

For employees to be similarly situated, "all of the relevant aspects" of their employment situations must be "nearly identical." McFadden v. Ballard, et al., 580 F. Supp. 2d 99, 109 (D.D.C. 2008) (quoting Neuren v. Adduci, et al., 43 F.3d 1507, 1514 (D.C. Cir. 1995)); see also Brady, 520 F.3d at 495 (employees are similarly situated if they share "the same factual circumstances").

If no reasonable juror could conclude that two employees were similarly situated, then a court may find they were not similarly situated as a matter of law.  See George v. Leavitt, 407 F.3d at 414-15.

### 1.   Keller

Despite her own problems at work, Plaintiff argues that Keller, a Caucasian male, was similarly situated but treated favorably.  Plaintiff states that Keller's "shameful record of incompetent work performance was commonly known by many."  Pl.'s Mot. at 18.  The Government concedes that Plaintiff and Keller were similarly situated in four respects:  (1) they held the same positions, (2) they performed the "same duties and had the same responsibilities," (3) Musheno supervised both of them, and (4) they were disciplined and given "Does Not Meet Expectations" summary ratings on their 2001 PARs.  Def.'s Reply at 4.  However, as the Government argues, the "comparisons stop there."  Id.

For example, although Plaintiff has alleged that Keller also used his computer for "personal matters,"[6] Keller denied this allegation, Musheno never caught Keller playing video games, there was no OPR investigation into his computer use, and the OPR never found that Keller had been insubordinate or had violated FBI security policy.  Loading video games onto her work computer and playing them during work hours was a significant problem in Plaintiff's performance that differentiated the two employees.

Similarly, Plaintiff does not allege that Keller left his safe unlocked as many times as she did, or that any supervisor ever discovered he had done so. Plaintiff simply makes the conclusory allegation that Keller left his safe unlocked, but she provides no evidence to support this accusation.[7]  Leaving a safe unlocked in a workplace that places an extremely high priority on maintaining security and "chain of custody" in criminal cases is obviously a serious problem.  That Keller and Plaintiff differ in this regard shows that their factual circumstances are far from identical.

In addition, even though Plaintiff and Keller both had performance problems, the Government argues that Keller's problems

---

[6]    Plaintiff has provided no evidence to support this allegation.  In fact, in her own Affidavit, she stated only that she "suspect[s]" that the other VCSs also play video games.  Def.'s Reply, Ex. 2.

[7]    To support her claim, Plaintiff cites to page 60 of the Snyder Deposition, but nothing on that page of the Deposition refers to Keller leaving a safe unlocked.

were qualitatively different from Plaintiff's.  Def.'s Reply at 10.
The Government argues that Plaintiff's problems related only to
work quality and work efficiency, whereas Keller's related only to
work efficiency.  Id. at 11.  In response, Plaintiff argues that
four depositions -- from Musheno, Linden, Ryan, and Snyder --
indicate that Keller, like Plaintiff, suffered from quality
assurance problems.

     In fact, none of these depositions bolsters Plaintiff's
argument.[8]  When Musheno is asked whether he met with Keller to "go
over errors that he had made on cases," Musheno answers, "Possibly,
but rarely."  Def.'s Reply at 12.  This vague response does not
substantiate Plaintiff's argument that Keller's work suffered from
the same type of consistent and egregious quality assurance
problems as Plaintiff's.

     Similarly, Linden stated only that there "could have been"
quality assurance problems.  Pl.'s Opp'n, Ex. H (emphasis added).
He made this statement in response to a direct question from
Plaintiff's counsel, but in his subsequent discussions of Keller's
performance problems, every example he provided referred to a work
productivity issue.  Id.  Likewise, even though Ryan stated that
Keller was not "strong technically," he did not say that his work

---

     [8]     In addition, Keller stated in his own deposition that he
was never cited for "any quality assurance problems" and that he
was never "made aware in any way" that there were "quality
deficienc[ies]" in his work.  Def.'s Reply at 13.

was, in Plaintiff's words, "shameful" or "incompetent."   Pl.'s
Opp'n, Ex. N.   Finally, even though Snyder suggested that the
timely return of examination projects might be considered a quality
assurance issue, she also stated that she did not recall ever
having a quality assurance issue brought before her during the
period between 2000 and 2002 that involved Keller.[9]

The two employees are distinguishable in seven other respects.
Plaintiff botched an expedited request.   The audit of five of
Plaintiff's projects revealed errors in each one.  Keller initiated
his own transfer to Quantico prior to July 2002 and "made room for
himself."   Def.'s Mot., Ex. 47.   In contrast, Plaintiff was
initially resistant to transferring and never took the initiative
to make room for herself.   Def.'s Mot., Ex. 47 (in Plaintiff's
Deposition, she stated that "we weren't crazy about the idea [of
transferring to Quantico] to put lightly").   In addition, Plaintiff
attended a training that a supervisor told her not to attend, twice
failed to document information properly, and twice failed to label
evidence.

---

[9]     This suggestion by Snyder does not raise a genuine issue
of material fact about whether Keller and Plaintiff both suffered
from quality assurance problems.   First, she provided this
statement in response to a confusing and unclear deposition
question.   Second, she construed the term "quality assurance," as
it would be used by an accreditation organization and not as it
would be used by the FBI.   Third, and most significantly, when she
was asked if there were "ever any quality assurance issues or
performance issues raised or concerns brought to your attention
regarding [Keller] specifically in 2000 to 2002," she responded,
"Not that I recall."

Finally, the two employees are distinguishable because, unlike Plaintiff, Keller's performance improved after he received the "Does Not Meet Expectations" PAR.  Compare Def.'s Mot., Ex. 43 (letter informing Plaintiff that "[y]ou have been given ample opportunity to improve your performance and have failed to do so") with Def.'s Mot., Ex. 23A (email from Musheno to Keller on January 23, 2002, stating that "I hear you are doing a fine job"). Plaintiff provides many examples of Keller's performance problems but only one of them occurred after Keller received the "Does Not Meet Expectations" PAR on January 7, 2002.  On April 29, 2002, Keller emailed Musheno a news story about the FBI's investigation of bank robberies, and Musheno reprimanded him for not devoting more time to meeting his case production requirements.  Pl.'s Opp'n, Ex. R.

This one incident does not demonstrate that Keller's performance continued to fall below "expectations" after the PAR period, that Keller's performance did not improve, or that Keller and Plaintiff exhibited the same degree of performance problems. See Pl.'s Opp'n, Ex. D (statement by Musheno that performance is evaluated over a period of a full year, not over "two weeks" or "two days).

For these reasons, no reasonable juror could conclude that Plaintiff and Keller were similarly situated.

### 2.   Williams

Plaintiff also alleges she was similarly situated to Williams and that Williams received favorable treatment.  Am. Complaint ¶ 23.  In response, the Government argues that the two employees were not similarly situated because their job responsibilities and pay grades were different and because they reported to different supervisors.  Def.'s Mot. at 14, 35.  Specifically, the Government stated that Williams was classified as a Systems Specialist rather than a VCS and was supervised by Richard Vorger Bruegge and not DeVincentis, Linden, Ryan, or Musheno.  Id.

It is well-settled that where a non-moving party fails to oppose arguments set forth in a motion for summary judgment, courts may treat such arguments as conceded.  Malik, 538 F. Supp. 2d at 52-53.  Where, as here, "a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."  Id.

In this case, Plaintiff did not respond to the Government's arguments.  Accordingly, Plaintiff has conceded them and therefore has not carried her burden to show that Williams was a similarly situated employee.

In addition, the law is clear that two employees with different job titles, job responsibilities, pay grades, and supervisors are not similarly situated.  See McFadden v. Ballard,

<u>Spahr, Andrews & Ingersoll, LLP</u>, 580 F. Supp. 2d 99, 109-110 (D.D.C. 2008) (to determine whether two employees are similarly situated, courts "look to, inter alia, whether the alleged comparators 'dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'") (quoting <u>Childs-Pierce v. Util. Workers Union of Am.</u>, 383 F. Supp. 2d 60, 70 (D.D.C. 2005)).  Accordingly, no reasonable juror could conclude that Plaintiff and Williams were similarly situated.

### D.   No Reasonable Juror Could Conclude that the Government Retaliated Against Plaintiff

Plaintiff also alleges that the Government retaliated against her.  In a retaliation claim, once an employer has introduced a legitimate, nondiscriminatory explanation for its actions, "the only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation either directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  <u>Jones v. Bernanke</u>, 557 F.3d 670, 678 (D.C. Cir. 2009) (quoting <u>Postal Serv. Bd. of Governors v. Aikens</u>, 460 U.S. 711, 716 (1983)).

As with the discrimination claim, Defendant argues that its actions were due to Plaintiff's poor performance.  Plaintiff offers only one statement to rebut this argument.  In an Affidavit, Keller

stated that "[e]ven though I cannot prove it or pinpoint why, I do feel that Management within the FAVIA Unit does retaliate against those who speak out or against those who do not fit into their mold." Pl.'s Opp'n, Ex. T.  This statement is purely subjective, as well as speculative, and is not corroborated by any other evidence in the record.  It makes only a generalized allegation, and makes no specific reference to Plaintiff, to any particular supervisor who might have retaliated against her, or any specific incident of retaliation.

In addition, as discussed at length <u>supra</u> III.B and III.C, there is substantial evidence in the record that Plaintiff performed poorly, compromised FBI security, and was insubordinate.

For these reasons, no reasonable juror could conclude that discrimination motivated the Government or that the Government's nondiscriminatory explanation was a pretext.

**IV.  CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment [Dkt. No. 47] is **granted.**   An Order shall accompany this Memorandum Opinion.


                                      _____/s/_____
May 5, 2009                           Gladys Kessler
                                      United States District Judge


**Copies to: Attorneys of record via ECF**

-25-